**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| RONNOCO COFFEE LLC, ) | |
| d/b/a Ronnoco Beverage Solutions, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 4:20-CV-1401 RLW |
| v. ) | |
| ) | |
| CHARLES PEOPLES, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Plaintiff Ronnoco Coffee LLC, d/b/a Ronnoco Beverage Solutions ("Ronnoco") filed this diversity action on September 29, 2020.  The case arises out of the alleged breach of a non-competition and non-disclosure agreement between Ronnoco and its former employee, Defendant Charles Peoples ("Peoples").  Ronnoco's Amended Complaint (ECF No. 11) asserts claims for breach of contract, breach of the duty of loyalty, violation of the Missouri Uniform Trade Secrets Act, and injunctive relief.  For the following reasons, Ronnoco fails to establish its right to judgment or permanent injunctive relief on any of the claims in its Amended Complaint.  The Court will vacate the Temporary Restraining Order and Order of Contempt previously entered and dismiss this action with prejudice.

## Procedural Background

The Court issued a Temporary Restraining Order (ECF No. 39) on November 23, 2020, after a telephone hearing with counsel for both parties on November 18, 2020.  The Court temporarily restrained Peoples, his agents, and all other persons in active concert with him until further Order of the Court from directly or indirectly:

(1) With respect to confidential and proprietary information, including trade secrets, of Ronnoco/Trident, from disclosing, using, or providing any such documents, information, or trade secrets, directly or indirectly, to anyone, except

for the return of such documents, information, or trade secrets directly to Ronnoco or its attorneys;

(2) Acting, directly or indirectly (whether as an owner, employee, consultant, independent contractor or any other role) in any capacity with a company that directly competes with Ronnoco/Trident, including but not limited to Smart Beverage, d/b/a Thirsty Coconut; and

(3) Calling upon, soliciting, diverting, attempting to call upon, solicit, or divert (or assist in any of the foregoing), or accept business from/do business with any customer/potential customer of Ronnoco/Trident that was a customer/potential customer during Peoples' employment with Ronnoco/Trident.

Order Granting Temporary Restraining Order ("TRO") (ECF No. 39 at 16).

The Court consolidated trial on the merits and the preliminary injunction hearing on its own motion and with the parties' consent by Order of December 15, 2020 (ECF No. 48). See Rule 65(a)(2), Fed. R. Civ. P.   Ronnoco filed a motion for contempt on December 23, 2020, which alleged violations of the TRO by Peoples and his new employer, non-party Smart Beverage, LLC, d/b/a Thirsty Coconut ("Thirsty Coconut").   The Court held an evidentiary hearing on the motion for contempt on January 11, 2021, and held Peoples and Thirsty Coconut in civil contempt on January 25, 2021.   See Findings of Fact, Conclusions of Law, and Order of Contempt (ECF No. 97).   The Court conducted a bench trial on the merits of this matter by Zoom video teleconference on February 8 and 9, 2021.   The parties submitted proposed findings of fact and conclusions of law for the Court's consideration.

Defendant Peoples filed two motions to dismiss the case, one asserting that Ronnoco lacked standing and the other asserting that diversity jurisdiction did not exist because the amount in controversy was less than $75,000.   Peoples also filed a motion to reopen the evidence that requested the Court to take judicial notice of new evidence disclosed by Ronnoco in a related case, Ronnoco Coffee, LLC v. Kevin Castagna, et al., 4:21-CV-71 JAR (E.D. Mo.) (the "Castagna case").   The Court denied Peoples' motions to dismiss and granted the motion to reopen the evidence.   See Mem. and Order of Sept. 13, 2021 (ECF No. 148).

Pursuant to Rule 52(a)(1), Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.   The Court incorporates herein by reference Peoples' admissions to Ronnoco's requests for admissions.   Pl.'s Tr. Ex. 99.

### Findings of Fact

Ronnoco is a Delaware limited liability company with its principal place of business in St. Louis, Missouri.   Ronnoco has sold and distributed coffee and other products in the United States for over 100 years.   Ronnoco has expanded geographically and over time expanded its product offerings beyond coffee to include a variety of dispensed beverages.

In February 2020, Ronnoco acquired a majority interest in Trident Marketing, Inc., a Georgia corporation, and Trident Beverage, Inc., a North Carolina corporation (collectively, "Trident").   Trident sells a line of 100% juice beverage concentrates under the name "Juice Alive" that are served frozen from machines.   Prior to Ronnoco's acquisition of Trident, all of Trident's stock was owned by brothers John Walker and Patrick Walker (collectively, "the Walkers").

As part of the acquisition, two new limited liability company entities were formed under the laws of the State of Delaware: Trident HR Holdings, LLC ("Trident Holdings") and Trident HR Intermediate, LLC ("Trident Intermediate").   In the transaction, the Walkers sold 80% of their Trident stock to Trident Intermediate and contributed the remaining 20% of the stock to Trident Holdings.   As a result, the Walkers retained a 20% equity interest in Trident Holdings through their respective LLC membership interests.   Trident Holdings contributed the Walkers' Trident stock into Trident Intermediate, so that Trident Intermediate owns 100% of Trident's stock. Trident Holdings owns 100% of Trident Intermediate as the sole member of that LLC.   Plaintiff

Ronnoco owns 80% of Trident Holdings and the Walkers own the remaining 20%.   The post-acquisition structure of the companies is shown on Ronnoco's Exhibit 5, RONNOCO_00145.[1]

Each company in the chain of ownership between Ronnoco and Trident is a separate legal entity.   Ronnoco and Trident have separate federal employer identification numbers, different shareholders and boards of directors, and separate financial statements, records, and reports.

Trident has a product catalog of juice beverages, including Juice Alive frozen juice slushies, and other products that it sells and distributes, primarily to public school districts.   In Texas, public school districts participate in purchasing cooperatives ("co-ops"), which select and approve vendors such as Trident through a competitive bidding process.   The vendors whose bids are approved by a co-op then compete for the business of the individual school districts that are members of that co-op.

From approximately May 2014 until Ronnoco acquired a majority interest in Trident Holdings, Defendant Peoples was an employee of Trident Beverage, Inc.   Peoples was Trident's Territory Manager for an area from Waco, Texas to the southern border of Texas, and from the eastern border of Texas to San Angelo, Texas.   Peoples' duties at Trident included preparing and submitting bid proposals to the purchasing co-ops.   When Trident's bid was approved by a co-op, Peoples was responsible for sales and customer service to the co-op member school districts in his territory.   A large part of Peoples' duties involved selling Juice Alive frozen juice beverages to Texas school districts.

---

[1] The facts concerning Ronnoco's acquisition of Trident are based on John Walker's testimony in the Castagna case.   The testimony differs from Mr. Walker's testimony in the present case, which was less detailed and, in particular, omitted the existence of Trident Intermediate.   The Court took judicial notice of Mr. Walker's testimony in Castagna when it granted Peoples' Motion to Reopen Evidence.   Also, Ronnoco submitted for *in camera* review portions of the underlying documents from the acquisition, which it produced on a "Confidential" basis in Castagna.

Trident Beverage, Inc. required Peoples to sign an Agreement to Protect Confidential Information and Business Relationships (the "Trident Agreement") in May 2014.  (ECF Nos. 24-4; 24-5 at 7).  The Trident Agreement defined Trident Beverage, Inc. to include it "and/or any successor company or other succession in interest."  (ECF No. 24-4 at 1.)  The Trident Agreement provided in pertinent part that Peoples would not disclose Trident's confidential information as defined therein, and would not compete against Trident or interfere with its business for specific periods of time after the termination of his employment.  (Id. at 2.)

When Ronnoco acquired a majority interest in Trident Holdings in February 2020, Peoples remained a Trident employee.  Not long after the acquisition, Peoples also became a Ronnoco employee.  (ECF No. 11-1, Offer of Employment letter of Mar. 17, 2020.)  The Offer of Employment letter states in part that it "will confirm [Peoples'] position as the Territory Manager at Trident and Ronnoco Beverage Solutions (Ronnoco)."  (Id.)  After the acquisition, Peoples was paid by Ronnoco only, and was told he would be selling Ronnoco products in addition to the products he sold for Trident, including selling coffee to convenience stores and participating in efforts to create coffee stands in Texas schools that would offer Ronnoco coffee.

After Ronnoco acquired its interest in Trident, Trident planned to offer Ronnoco coffee products to its existing customer base.  Trident's 2020-21 School Beverage Product Catalog (Pl.'s Ex. 200) includes some Ronnoco coffee offerings in addition to products it had sold for years.   In general terms, Ronnoco and Trident were merging their products in the catalog and trying to make all of the products available to Trident's customers.

Before Trident makes a sale of a Ronnoco product to one of its school district customers, it purchases the product from Ronnoco at an intercompany transfer price that includes a ten percent (10%) profit margin for Ronnoco on the sale.   Trident then adds a markup to the price it paid to Ronnoco, which it passes along to the public schools.   Similarly, Ronnoco purchases juice

products from Trident and pays it an intercompany transfer price that includes a ten percent (10%) profit margin for Trident on the sale.

On March 18, 2020, Ronnoco and Peoples entered into an agreement titled Fair Competition Agreement ("FCA").   (ECF No. 11-2.)   Ronnoco and Peoples are the only parties to the FCA, which is the contract at issue in this lawsuit.   The FCA refers to Ronnoco as "the Company," and places certain non-competition and non-disclosure obligations on Peoples.   The FCA states that in consideration of Peoples' employment and/or continuation of employment with Ronnoco, he agreed that:

> During my employment, I will form certain customer relationships that are part of the Company's goodwill, and I will have access to and knowledge of the Company's trade secret "Confidential Information," as defined in Section 4 below.   I agree that the Company is entitled to protect its investment in the foregoing and to keep the results of its efforts, being its goodwill, the goodwill and loyalty of its customers, and its Confidential Information, for its exclusive use through the enforcement of the obligations set forth in this Agreement, which are reasonable and necessary for that purpose and will survive the cessation of my employment with the Company, regardless of the reason for such cessation.

(Id. ¶ 1) (emphasis added).

Peoples agreed that for two years after leaving his employment with Ronnoco, and within two hundred miles of any of his work locations for Ronnoco, he would not—

> directly or indirectly, for myself or on behalf of or in connection with any other person, entity or organization: (a) engage in any business or activity that is competitive with the business of the Company; (b) own, manage, maintain, consult with, operate, acquire any interest in, or otherwise assist or be connected with (including, but not limited to, as an employee, consultant, or otherwise) any business that directly or indirectly competes or is seeking to compete with the business of the Company; and/or (c) undertake any efforts or activities toward commencing any business or activity that could be competitive with the business of the Company.

(Id. ¶ 2.)

The FCA defines any "business" or "activity" of the Company to include "any business or activity in which the Company is actually engaged, or to my actual knowledge, any prospective business or activity of the Company;" "competition" as "any third party which attempts to replace

or otherwise interfere with all or any portion of the existing or prospective business between the

Company and a third party," and "compete" as "the act of being competitive."   (Id.)

Peoples agreed in the FCA not to induce or attempt to induce Ronnoco's employees to

leave it, or to solicit Ronnoco's clients with whom he had material contact, as follows:

> During my employment and for two (2) years thereafter, I will not, directly or
> indirectly, for myself or on behalf of or in connection with any other person, entity
> or organization: (a) induce or attempt to induce any employee or consultant of the
> Company to leave the employ or services of the Company or in any way interfere
> with the relationship between the Company and any employee or consultant
> thereof; and/or (b) call on, solicit, have contact with, or service any client of the
> Company with whom I have had material contact, in order to (i) solicit business of
> the type provided by the Company, (ii) to induce or attempt to induce such person
> or entity to cease doing business with, or reduce the amount of business conducted
> with, the Company, or (iii) in any way to interfere with the relationship between
> any such person or entity and the Company.

(Id. ¶ 3.)

The FCA also required Peoples to agree not to use or disclose Ronnoco's confidential

information:

> I will keep confidential and not disclose or use, either during or after my
> employment, any Confidential Information of the Company, except as required in
> good faith in performing my employment duties for the Company or as authorized
> by the Chief Executive Officer of the Company in a signed writing addressed
> specifically to me.   "Confidential Information" means any information that is used,
> developed, obtained or received by the Company in connection with the Company's
> customer or supplier relationships and its other trade secrets, including but not
> limited to the following: (a) client and prospective client information, including
> client lists, compilations of client data, client preferences, and personal and/or
> financial information relating to clients; (b) business information, including
> contractual arrangements, business plans, strategies, tactics, policies, procedures,
> resolutions, litigation or negotiations; (c) marketing information, including sales or
> product plans, strategies, tactics, methods, or market research data; (d) financial
> information, including costs and performance data, pricing information, sales
> figures, profit or loss figures, debt arrangements, equity structure, investors and
> holdings; (e) personnel information, including personnel lists, resumes, personnel
> data, organizational structure and performance evaluations; and (f) product or
> service information, such as drawings, schematics, sketches, models, software,
> hardware, computer systems, source codes, suppliers, materials, equipment,
> research and development data, testing data, and other similar records.   If ordered
> by a court of competent jurisdiction to disclose Confidential Information, I will
> provide written notice to the Company of such order immediately and cooperate in

its efforts to safeguard such information.    For the avoidance of doubt, Confidential Information does not include information in the public domain.

(Id. ¶ 4.)

Under the FCA's terms, Peoples acknowledges that the breach of any of its provisions would result in immediate and irreparable harm to Ronnoco for which no adequate remedy at law exists; that public policy would be furthered by enforcement of the FCA by an injunction; that injunctive relief would not deprive Peoples of an ability to earn a living because he is qualified for many positions that do not involve competing with Ronnoco or that necessitate the breach of any provision of the FCA; and that Ronnoco would be entitled to enforce the Agreement by injunction or other equitable remedies in the event of a breach.   (Id. ¶ 8.)   The FCA provides that if Peoples violates any of his obligations thereunder, the applicable restricted period will be extended to account for the period during which he was in breach, and Peoples agrees to pay Ronnoco's "reasonable legal fees and costs associated with any enforcement action."   (Id. ¶ 9.)

The FCA specifies that it and the terms and conditions of Peoples' employment are governed by Missouri law.   (Id. ¶ 11.)

The FCA provides that it "constitutes the complete understanding between [Ronnoco] and [Peoples] regarding the subject matter of this Agreement, and it shall inure to the benefit of the Company and its successors and assigns. . . . . This Agreement supersedes all prior representations and understandings, whether oral or written, with regard to the subject matter of this Agreement." (Id. ¶ 12.)

After Ronnoco acquired Trident, Peoples primarily continued to perform the same duties as he had with Trident.   The acquisition coincided with the beginning of the COVID-19 pandemic, and most Texas public schools were closed or closed the ala carte area in their cafeterias, so very few schools were serving frozen juice beverages out of machines and Trident's sales declined significantly.

Peoples visited Ronnoco's St. Louis headquarters in January 2020, while he was still a Trident employee, to attend a meeting at which he was introduced to Ronnoco staff.   Peoples did not learn any of Ronnoco's confidential information at the meeting.   Peoples also was present at Trident's Katy, Texas office when some Ronnoco members came to Texas.

In Peoples' position as Territory Manager for Trident and then later as Territory Manager for Trident and Ronnoco, he had access to confidential information in Quickbase, Trident's customer resource management system.   The data in Quickbase does not include information about Ronnoco's customers.   Quickbase included information concerning Trident's customers' names and contact information, the beverage dispensing machines each customer had and the installation dates, what products were being sold to the customers, and at what prices.

Peoples accessed Quickbase using a username and password.   Only Trident's Territory Managers, such as Peoples, had access to all of the customer information in Quickbase.   The Quickbase system has different levels of security for other employees such as delivery drivers or service technicians.   Peoples knew who the "good" and "bad" customers were, and how much of an investment Trident had made in each.   He knew Trident's bidding and general sales strategies, products lines, and its customers' specific requirements, specifications, and purchases.

Peoples began working on Trident's bid to the Texas 20 purchasing co-op by at least early March 2020.   He talked with Trident's President, John Walker, about the pricing Trident should use for the bid.   Peoples recommended to Walker that Trident not increase the pricing from the prior year's bid but Walker made the final decision.   The pricing Trident intended to submit on its bid was not known to anyone outside of Trident.   After bids to Texas purchasing co-ops are awarded, however, the successful bidders' pricing information is obtainable through Freedom of Information Act requests.   Thus, Trident's competitors on 2020 bids could have known what Trident successfully bid to the Texas 20 co-op in 2019.

Peoples submitted Trident's bid to the Texas 20 co-op on April 8, 2020. The bid did not include any Ronnoco products. Texas law requires that a bidding entity certify if it is or is not a resident of the State of Texas, and Peoples certified that Trident met this requirement because its principal place of business was in Houston, Texas. Trident's Texas 20 bid did not disclose any "interested parties," i.e., parties that own at least 10% of Trident, on the bid's Certificate of Interested Parties.

Trident and non-party Thirsty Coconut had entered into a distribution agreement in October 2014, and Thirsty Coconut distributed Trident's products in states other than Texas. Peoples was aware of this distribution agreement, and knew that Thirsty Coconut had no sales presence in Texas prior to 2020.

Thirsty Coconut submitted a bid to the Texas 20 co-op on April 16, 2020, signed by its owner and President, Luke Einsel. This was the first time Thirsty Coconut had ever submitted a bid to a Texas school district purchasing cooperative. Peoples had known Einsel for years. Telephone records do not show any calls between Peoples and Einsel between March 14, 2020, when the records in evidence begin, and April 9, 2020. Peoples had a 110-minute telephone conversation with Einsel on April 9, 2020. Peoples and Einsel had six telephone calls that totaled 106 minutes on April 14, 2020. The day before Thirsty Coconut submitted its bid, Peoples and Einsel had three phone calls that totaled 60 minutes. Three minutes after Thirsty Coconut submitted its bid on April 16, 2020, Einsel called Peoples and they spoke for 58 minutes.

Einsel and Thirsty Coconut are based in the Kansas City area. Thirsty Coconut's bid to Texas 20 certified it was a resident Texas bidder and listed Peoples' home address in Katy, Texas as its principal place of business, although this was not true. Peoples admits providing his home address to Einsel as early as February 2020 "for mailing purposes" after Einsel told Peoples he would be "getting some mail in Texas," though he denies providing his address to Thirsty Coconut

for business purposes.   Thirty Coconut's bid also certified, as required by Texas law, that it was not owned or operated by anyone who had been convicted of a felony.[2]

Ronnoco and Thirsty Coconut were each selected as successful bidders by the Texas 20 co-op and awarded contracts as vendors.   As a result, the two companies were authorized to compete with each other to sell their products to Texas 20's individual school district members.

John Walker fired Peoples on May 17, 2020, after Peoples said he did not want to attend a meeting set for 4:00 p.m. on a Friday afternoon.   Trident and Ronnoco sent Peoples a formal notice of termination on joint letterhead signed by Ronnoco's Human Resources Manager that terminated his employment as of May 20, 2020.

Trident submitted a bid to another Texas purchasing co-op, Choice Partners, on May 22, 2020.   Trident's bid did not disclose Ronnoco as an interested party in Trident.   The bid included a proposal to sell a quantity of Ronnoco coffee to Choice Partners co-op members for a total price of $5,000.

Peoples began working for Thirsty Coconut shortly after he was terminated by Ronnoco and Trident.   Peoples' employment with Thirsty Coconut was located within 200 miles of his former work location for Ronnoco and Trident, and his new territory included all of the area he formerly covered for Ronnoco and Trident.   Peoples admitted that he downloaded and retained confidential information from Trident's Quickbase customer resource management system after

---

[2]This certification was incorrect as Einsel has one or more felony convictions.  An attorney for Trident Beverage contacted the Harris County, Texas Department of Education in September 2020 and informed it that Thirsty Coconut's principal place of business was in Kansas and that Luke Einsel had felony convictions.  Pl. Ex. 71.  The Texas 20 co-op elected to terminate its contract with Thirsty Coconut as a result.  In an email to his contacts at a Texas 20 member district, Peoples stated in part, "TX. 20 has removed us on a technicality brought on by your friend."  Pl. Ex. 72.  The term "your friend" was a reference to John Walker.  Tr. Tr. Vol. I 86:21-87:6.  The Choice Partners purchasing co-op, which is discussed later, did not terminate its contract with Thirsty Coconut upon learning this information.

he left Ronnoco and Trident's employment, and used the information to help with his work for Thirsty Coconut in competing against Trident.

Peoples submitted Thirsty Coconut's bid to Choice Partners on May 25, 2020.   Peoples certified that Thirsty Coconut was a resident Texas bidder and listed his home address as Thirsty Coconut's principal place of business.   Peoples knew that Thirsty Coconut's principal place of business was actually in Olathe, Kansas.   Peoples also knew that by submitting Thirsty Coconut's bid to Choice Partners he was competing directly with Trident.   Thirsty Coconut's bid did not include coffee.

Peoples sent an email using his Smart-Beverage.com email address to Thirsty Coconut's Vice-President, Garth Einsel, on May 27, 2020, asking him to send Peoples a copy of Thirsty Coconut's Texas 20 award letter and email.   The same day, Peoples sent an email to Luke Einsel that said, "You mentioned that the contract you signed with [Trident] expired.   Is that correct? There is going to be a battle as soon as TX. 20 announces their decision. . . . . Also, please send me a copy of the award letter and award email for my records."   Pl's Ex. 47.   Peoples testified that he knew Ronnoco and Trident would be angry about Thirsty Coconut bidding on school co-ops in Texas because it was competition.

Also on May 27, 2020, Peoples sent an email to the Texas 20 co-op's administrator, telling her he would assist Texas 20 members in transitions to the new awarded vendor, Thirsty Coconut. Peoples began sending emails to his contacts at the member schools that he knew from working for Trident, informing them he had "moved on" from Trident and was now an "ambassador for [Thirsty Coconut]" and would work with them to transition seamlessly from Trident to Thirsty Coconut.   Peoples testified that he intended to try to win the business of all of the Texas 20 member schools for Thirsty Coconut.

Two days later, Luke Einsel sent an email to Thirsty Coconut managers, including Peoples, that said, "I have officially severed [Thirsty Coconut's] relationship with Juice Alive / Trident Beverage.   We will officially be distributing our own branded product for the 20/21 school year and expanding beyond our traditional borders.   Please do not engage in any conversations with them and direct all communication from them to me."   Pl.'s Ex. 50.   This email was sent after Thirsty Coconut had submitted bids to the Texas 20 and Choice Partners purchasing co-ops in direct competition with Trident.

Ronnoco, Thirsty Coconut, and non-party Barfresh were awarded Choice Partners co-op contracts as approved vendors for 2020.   Ronnoco had been the only approved Choice Partners vendor for 2019.   A business relationship exists between Thirsty Coconut and Barfresh, as Thirsty Coconut began buying Barfresh's juice product in May 2020 to replace the Trident Juice Alive juice product that Thirsty Coconut previously distributed.

Peoples denies helping Thirsty Coconut submit a bid to the Texas 20 co-op in competition with Trident while he was still employed by Ronnoco and Trident.   The Court finds this testimony is not credible based on Peoples' evasive testimony at trial, his demeanor at trial and at prior hearings in this case, and numerous other factors including (1) the evidence of numerous, lengthy telephone calls between Peoples and Luke Einsel shortly before and immediately after Thirsty Coconut submitted a bid to the Texas 20 co-op; (2) Peoples' email to Luke Einsel of May 27, 2020 that stated "[t]here is going to be a battle" when the Texas 20 co-op announced its decision, which indicates Peoples knew Thirsty Coconut had underbid Trident; (3) that Peoples allowed Luke Einsel to list his home address as Thirsty Coconut's principal place of business on its Texas 20 bid; (4) that Peoples misrepresented his home address as Thirsty Coconut's principal place of business on the Choice Partners bid; and (5) that Peoples admits downloading, retaining, and using

Trident's confidential customer information from its Quickbase program in his work for Thirsty Coconut.[3]

Ronnoco and Trident sent cease and desist letters to Peoples and Thirsty Coconut on August 5, 2020, but did not receive any response.   Peoples admitted that since leaving Ronnoco and Trident's employment, he has been in contact with customers he knew had existing contracts with Trident, he intended to solicit Trident's customers for Thirsty Coconut, and he worked with Thirsty Coconut to submit bids to customers that Trident was likely to solicit, many within 200 miles of his former Trident territory area.   Peoples admitted that Thirsty Coconut and Trident are in the same industry and compete directly in the area of frozen fruit juice beverages.

Peoples also admitted he had communications with other persons who are or were formerly employed by Trident and Ronnoco about those persons going to work for Thirsty Coconut.   (Pl.'s Ex. 99, Peoples' Resp. to Req. for Adm. 36.)   Peoples' admission to Ronnoco's Request for Admissions was the only evidence at trial concerning his solicitation of other Trident and Ronnoco employees.

Peoples also admitted that after the Court issued the TRO, he told Luke Einsel about the TRO but continued to work with Thirsty Coconut by communicating with its Office Administrator

_____

[3]Also relevant to the Court's credibility determination is Peoples' testimony that he applied for and received Texas unemployment benefits after he was fired by Trident and Ronnoco but while he was working for Thirsty Coconut.   Peoples was receiving unemployment benefits at the time of trial on February 8, 2021.   Thirsty Coconut was to pay him $3,000 per month base salary plus commissions.   Peoples testified that Thirsty Coconut had not paid him any salary, but Luke Einsel gave him a $15,000 personal check on November 3, 2020, that was a loan.   There is no documentation, interest, or repayment date for the loan, which Peoples termed "a gentleman's agreement between Luke and I."   At the time of the "loan," Peoples had worked for Thirsty Coconut approximately five months, so his base salary for that period would have been $15,000, the same amount as the loan.   Peoples admitted that if the $15,000 was compensation for his work at Thirsty Coconut, then his receipt of unemployment benefits would not be legitimate.   Trial Tr. Vol I. 91:13-93-10.   The Court finds the so-called loan from Einsel was payment of Peoples' base salary for a five-month period.

about customers' needs, emailing Thirsty Coconut's school district customers that were former Trident customers, making deliveries to those school districts, and picking up a school's beverage machine that needed servicing.   See ECF No. 90, Tr. Mot. Contempt Hrg. 6:17-7:21.   Once Peoples complied with the TRO and stopped working for Thirsty Coconut, he made plans to start his own company and formed a limited liability company to sell a grab-and-go yogurt/juice beverage to schools.

Trident's President John Walker testified that Peoples said he did not want to sell coffee. Walker was not aware that Peoples sold any coffee once he became an employee of both Trident and Ronnoco.   Walker admitted that Peoples established relationships with both the Texas 20 and Choice Partners purchasing co-ops while he was a Trident employee, prior to the date he became an employee of both Trident and Ronnoco.   Walker also testified he did not know if Peoples formed any new customer relationships after he became an employee of both Trident and Ronnoco. The Court finds that the Texas 20 and Choice Partners purchasing co-ops were not Ronnoco's customers but instead were Trident's customers.

Ronnoco does not submit bids to any Texas K-12 purchasing cooperatives to become an approved vendor for their member schools, does not sell directly juice beverages or any other product to Texas K-12 public school districts, and does not provide beverage dispensing machines, deliver products, or provide customer service to Texas K-12 public school districts.   The Court finds that Ronnoco does not compete in the Texas K-12 public school market.

## <u>Conclusions of Law</u>

The Court has jurisdiction of the parties and the subject matter of this case pursuant to 28 U.S.C. § 1332(a), as discussed more fully in the Memorandum and Order of September 13, 2021 (ECF No. 148), that denied Peoples' motions to dismiss for lack of subject matter jurisdiction.

Ronnoco presented facts showing it is a party to an allegedly breached contract.  As a result, it has a "judicially cognizable interest for standing purposes, regardless of the merits of the breach alleged."  Carlsen v. GameStop, Inc., 833 F.3d 903, 908 (8th Cir. 2016) (citing ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters, 645 F.3d 965, 960 (8th Cir. 2011)).  Under Missouri law, "Only parties to a contract and any third-party beneficiaries of a contract have standing to enforce" the contract.  Verni v. Cleveland Chiropractic College, 212 S.W.3d 150, 153 (Mo. 2007) (en banc) (citing Andes v. Albano, 853 S.W.2d 936, 942 (Mo. 1993) (en banc)).  Because Ronnoco and Peoples are the parties to the FCA, Ronnoco has standing to bring this action.

In a diversity action, state law governs the rules for construing contractual agreements.  Orion Fin. Corp. of S. Dak. v. American Foods Group, Inc., 281 F.3d 733, 738 (8th Cir. 2002).  Missouri substantive law applies to the case based on a choice of law provision in the Fair Competition Agreement between the parties, and the parties do not contest the application of Missouri law.   The Court is bound by the decisions of the Missouri Supreme Court in determining the scope of Missouri law.   Taylor v. St. Louis Cnty. Bd. of Election Comm'rs, 625 F.3d 1025, 1027 (8th Cir. 2010).

A. Breach of Contract – Count I

Under Missouri law, the essential elements of a breach of contract action are: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff."  Keveney v. Mo. Military Acad., 304 S.W.3d 98, 104 (Mo. 2010) (en banc).  A plaintiff must "identify which rights or obligations [the defendant] breached under the contract in order to establish a claim for breach of contract."  Lucero v. Curators of Univ. of Mo., 400 S.W.3d 1, 5 (Mo. Ct. App. 2013) (quotation and citation omitted).

The interpretation of a contract is a question of law in Missouri.   Leggett v. Mo. State Life Ins., 342 S.W.2d 833, 850 (Mo. 1960) (en banc).   The "cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent."   Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15, 21 (Mo. 1995) (en banc) (citing Royal Banks of Mo. v. Fridkin, 819 S.W.2d 359, 362 (Mo. 1991) (en banc)).   It is presumed that the natural and ordinary meaning of the language used expresses the intent of parties to a contract.   J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club, 491 S.W.2d 261, 264 (Mo. 1973) (en banc).   "In interpreting a contract, [courts] must use the plain, ordinary, and usual meaning of the contract's words and consider the whole document."   Butler, 895 S.W.2d at 21 (citing Royal Banks, 819 S.W.2d at 362).

Missouri courts will enforce a non-competition agreement in limited circumstances that are "demonstratively reasonable."   Whelan Sec. Co. v. Kennebrew, 379 S.W.3d 835, 841 (Mo. 2012) (en banc).   "A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer."   Id. at 842 (quoted case omitted).   Under Missouri law "a non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.'"   Id. (quoting Healthcare Servs. of the Ozarks, Inc. v. Copeland, 198 S.W.3d 604, 610 (Mo. 2006) (en banc)).   "The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space."   Id.

Here, the first element is met because the existence of the non-compete and non-disclosure agreement between the parties is undisputed, and the relevant terms of the parties' Fair Competition Agreement are set forth above.   For the second element, Ronnoco tendered performance pursuant to the FCA by, among other things, employing Peoples.

As to the third element, Ronnoco contends it presented evidence that Peoples admitted to several breaches of the FCA, as follows: (1) Peoples' employment with Thirsty Coconut was located within 200 miles of his former work location for Trident and Ronnoco; (2) Peoples intended to divert the customers he served to Thirsty Coconut; (3) Peoples has been in contact with the same customers he served since leaving his employment with Trident and Ronnoco; (4) Peoples has worked for Thirsty Coconut to submit bids to customers that he knows are likely being solicited by his former employer; and (5) Peoples has communicated with Trident and Ronnoco employees about those persons going to work for Thirsty Coconut.

For the following reasons, the Court concludes Ronnoco does establish that Peoples breached the parties' contract.

To enforce the FCA, Ronnoco must prove it has a protectable interest.  JTL Consulting, L.L.C. v. Shanahan, 190 S.W.3d 389, 397 (Mo. Ct. App. 2006).   The FCA prohibits Peoples from engaging in any business or activity that competes with "the business of" Ronnoco, defined as "any business or activity in which [Ronnoco] is actually engaged, or to [Peoples'] actual knowledge, any prospective business or activity of the Company."   Ronnoco contends that by virtue of its acquisition of an 80% ownership interest in Trident Holdings, it became "engaged" in the same business or activity in which Trident had been engaged, i.e., selling fruit juice beverages to school districts, and became the majority owner of Trident's confidential information and trade secrets, i.e., Trident's client contact list and customer information.   Ronnoco also contends it merged its product line with Trident's and seeks to have Trident sell Ronnoco coffee in schools.

The issue of Ronnoco and Trident's corporate structure has been raised throughout this litigation.   Ronnoco has consistently referred to itself as "Ronnoco/Trident," suggesting that the two companies are one and the same.   Ronnoco's breach of contract claim rests primarily on the

fact that it owns 80% of Trident.   Ronnoco contends that based on this ownership interest and its claimed entitlement to 80% of Trident's profits, Trident's business is also Ronnoco's business.

Ronnoco's contention relies heavily on the Court's interlocutory findings in the TRO, made shortly after the case was filed.   These findings were based on a sparse record with minimal citation of supporting legal authority by the parties, particularly from Defendant Peoples.   At the start of trial, the Court pressed the parties to "substantiate or prove [your claims] and provide ample case authority for your positions," because "[s]o far both sides have not really put forth any authority for the positions you're advancing."   Trial Tr. 2:21-3:4 (ECF No. 124).

It is a basic principle of corporate law that a subsidiary is a legal entity separate from its parent.   See Dole Food Co. v. Patrickson, 538 U.S. 468, 475 (2003).   "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary."   Laredo Ridge Wind, LLC v. Nebraska Pub. Power Dist., 11 F.4th 645, 651 (8th Cir. 2021) (quoting Dole Food, 538 U.S. at 474-75, citing 1 W. Fletcher, Cyclopedia of the Law of Private Corps. § 31, at 514 (rev. ed. 1999) ("The properties of two corporations are distinct, though the same shareholders own or control both.   A holding corporation does not own the subsidiary's property.")); Hildene Opps. Master Fund, Ltd. v. Arvest Bank, 897 F.3d 980, 986 (8th Cir. 2018) (citing the "well-establish principle that parent companies do not own the assets of their subsidiaries.") (applying New York law).   "Legally, only the *shares* of a subsidiary may be considered an asset of the parent."   Dole Food, 538 U.S. at 475.

Missouri courts recognize and apply this principle.   "Two separate corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the other."   Blanks v. Fluor Corp., 450 S.W.3d 308, 375 (Mo. Ct. App. 2014) (citing Cent. Cooling & Supply Co. v. Dir. of Revenue, State of Mo., 648 S.W.2d 546, 548 (Mo. 1982)); see Grease Monkey Int'l, Inc. v.

Godat, 916 S.W.2d 257, 262 (Mo. Ct. App. 1995) ("In the eyes of the law, two different corporations are two different persons.   This is true even if one corporation is the sole shareholder of the other.")   "Ownership of capital stock in one corporation by another does not itself create identity of corporate interest as between the two." Cent. Cooling, 648 S.W.2d at 548 (holding that transactions between a parent corporation and its subsidiary incur sales tax).

Because parent corporations are separate entities from their subsidiaries, they are unable to assert the interests of their subsidiaries.   See Schenley Distillers Corp. v. U.S., 326 U.S. 432, 435 (1946).   "It is well established that a parent corporation and a subsidiary are in law separate and distinct entities, and under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both[.]"   Tennessee Valley Auth. v. Exxon Nuclear Co., 753 F.2d 493, 497 (6th Cir. 1985) (citing 1 W. Fletcher, Cyclopedia of the Law of Private Corps., § 43 (rev. perm. ed. 1983)); Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 26 (2e Cir. 1993) (same; citing 1 Fletcher Cyc. Corp. § 43 (perm. ed. 1990)).   Because parent and subsidiary corporations are separate entities, it has been stated that "in no legal sense can . . . the business of a subsidiary corporation be said to be that of a parent."   Fluor Intercont'l, Inc. v. IAP Worldwide Servs., Inc., 533 F. App'x 912, 926-27 (11th Cir. 2013) (Jordan, J., dissenting) (quoting Conn. Gen. Life Ins. Co. v. Superintendent of Ins. of State of N. Y., 176 N.E.2d 63, 66–67 (N.Y. 1961)).

Missouri courts require that the distinction between parent and subsidiary companies be maintained in the context of a contract, and reject the theory that a parent corporation acquires rights solely by virtue of its ownership of a subsidiary.   See Mid–Missouri Tel. Co. v. Alma Tel. Co., 18 S.W.3d 578, 582-83 (Mo. Ct. App. 2000) (parent corporation could not ignore the legal distinction between itself and its wholly owned subsidiary, and thus could not acquire a contractual

right that belonged to its subsidiary, or assume a similar right by virtue of its ownership of the subsidiary).

To be sure, Ronnoco asserts its own contractual rights in this case, not Trident's, as Ronnoco is a party to the FCA and Trident is not.   Ronnoco drafted the FCA and entered into it with Peoples.   Ronnoco chose not to include its subsidiary Trident as a party to the FCA and did not define the term "Company" to include its subsidiaries, even though Peoples was an employee of both Ronnoco and Trident.   The FCA specifies that it constitutes the "complete understanding between [Ronnoco] and [Peoples] regarding the subject matter of this Agreement," and it supersedes "all prior representations and understandings, whether oral or written, with regard to the subject matter of this Agreement."   This language encompasses the non-competition and non-disclosure Agreement between Trident and Peoples and, as a result, the FCA supersedes the Trident Agreement.

In signing the FCA, Peoples agreed not to compete with *Ronnoco's* business.   Ronnoco is a parent corporation that owns 80% of Trident through two layers of intermediate holding companies.   Based on the legal principles set forth above, the fact that Ronnoco has a majority ownership interest in Trident and claims entitlement to 80% of Trident's profits does not mean that Ronnoco owns Trident's assets, does not permit it to assert Trident's interests, and does not make Trident's business "the business of" Ronnoco within the meaning of the FCA.   To conclude otherwise would require the Court to disregard Ronnoco and Trident's separate corporate structures and the independent existence of each company.   Thus, to the extent Ronnoco attempts to assert its subsidiary Trident's interests in this case by virtue of Ronnoco's acquisition of a majority ownership interest in Trident, and/or its entitlement to a stream of profits from Trident, it cannot do so.   See Mid-Missouri Tel., 18 S.W.3d at 583.

Ronnoco attempted to establish that Trident's business of selling juice and related products in the Texas K-12 public school market is the "business of [Ronnoco]" as that term is defined in the FCA, but the evidence does not support this.   Unlike Trident, Ronnoco does not submit bids to Texas K-12 purchasing cooperatives to become an approved vendor for their member schools, does not sell juice beverages or anything else to Texas K-12 public school districts, and does not provide beverages dispensing machines, deliver products to, or provide customer service to Texas K-12 public school districts.   The fact that Ronnoco sells some of its coffee products to Trident at an intercompany transfer price for resale to Trident's public school customers does not establish that Ronnoco's business is selling to the Texas K-12 purchasing cooperatives.   The evidence also shows that while Trident and Peoples' new employer Thirsty Coconut are direct competitors in the Texas K-12 public school market, Ronnoco is not.   Ronnoco did not compete in that market, and the school purchasing co-ops and their members were not its customers.

As a result, the Court concludes Ronnoco has not established that Peoples engaged in any business or activity that competes with "the business of" Ronnoco, as opposed to the business of Trident.[4]   Ronnoco cannot sue for injuries to Trident's business, and the evidence does not establish injury to Ronnoco's business. This disposes of the majority of Ronnoco's breach of contract claims, including those based on Peoples working for Thirsty Coconut within 200 miles of his prior employment with Ronnoco and Trident, and Peoples submitting bids for Thirsty Coconut to customers that he knows are likely being solicited by Trident.

Ronnoco also asserts breaches of the FCA based on Peoples' intention to divert customers to Thirsty Coconut, and his actions in contacting, servicing, and soliciting the Texas 20 and Choice Partners purchasing co-ops and their member schools after he was fired by Ronnoco and Trident.

---

[4]This conclusion also applies to Peoples' creation of an LLC that he intended to use to sell a yogurt-based smoothie beverage to schools.   The Court will assume that this might compete with Trident's business, but it does not compete with Ronnoco's business.

The FCA provides in part that during Peoples' employment, he "will form certain customer relationships that are part of the Company's goodwill," and he will not "call on, solicit, have contact with, or service any client of [Ronnoco] with whom [he] has had material contact."

Under Missouri law, customer contacts are a protectable interest. JTL Consulting, 190 S.W.3d at 397.   But "before an employer can claim a protectable interest in customer contacts, an employer must first have a stock of customers who regularly deal with the employer." Id. at 398 (citing cases).   In Missouri, a "customer" is "someone who repeatedly has business dealings with a particular tradesman or business." Id. (citing cases).   "Unless the proponent of the restrictive covenant has a trade following, that is, a group of customers who regularly patronize the business of the particular employer, there can be no stock of customers and no protectable interest." Id. (quoted case omitted).

The FCA does not incorporate or refer to relationships that Peoples formed during his years working for Trident that preceded his employment with Ronnoco and Trident.   Ronnoco could have included such pre-existing customer relationships in the FCA, but it did not.   John Walker testified that Peoples established relationships with the Texas 20 and Choice Partners purchasing co-ops and their members while he was a Trident employee, and he did not know if Peoples formed any new customer relationships after he became an employee of both Trident and Ronnoco.

While Peoples had close and valuable contacts with the Texas K-12 purchasing co-ops and their members, the evidence showed these were Trident's contacts and customers.   Ronnoco did not establish that Peoples diverted or intended to divert, or called on, solicited, or served any of its customers.   Ronnoco's breach of contract claims relating to customer relationships and contacts are based on its majority ownership of Trident and its receipt of a stream of revenue from Trident as a result of that ownership.   This does not give Ronnoco a protectable interest in Trident's customers.   See Mid-Missouri Tel., 18 S.W.3d at 583.   Thus, Ronnoco did not establish that

Peoples' actions in calling on, soliciting, and servicing Texas 20 and Choice Partners member schools for Thirsty Coconut constitute a breach of the FCA.

Finally, Ronnoco presented uncontroverted evidence that Peoples induced or attempted to induce Ronnoco's employees to leave its employ.  This violates paragraph 3 of the FCA, and Ronnoco establishes the first three elements of this breach of contract claim.   Ronnoco did not offer any evidence of damages it suffered as a result of Peoples' inducement or attempted inducement of its employees, however.   "Damages are an essential element of a cause of action for breach of contract and must be proven.   The mere breach of a contract which causes no loss to plaintiff will not support a judgment."   Rice v. West End Motors Co., 905 S.W.2d 541, 542 (Mo. Ct. App. 1995) (quoted case omitted); see also Al-Khaldiya Electronics and Elec. Equip. Co. v. Boeing Co., 571 F.3d 754, 759 (8th Cir. 2009) (under Missouri law "a contract breach that causes no loss to the plaintiff will not support a judgment," citing Rice).   Because Ronnoco did not prove it suffered damages as a result of Peoples' inducement or attempted inducement of its employees, it fails to establish all of the elements of its breach of contract claim as to inducement.

Consequently, Peoples is entitled to judgment on all of Ronnoco's breach of contract claims in Count I.

B.   Breach of the Duty of Loyalty – Count II

In Missouri, a cause of action for breach of the duty of loyalty in the context of an employee acting in competition with his employer requires the following elements: "1) In general, an employee must not, while employed, act contrary to the employer's interest; 2) however, an employee may agree with others to compete upon termination of the employment and may plan and prepare for their competing enterprise while still employed; and 3) but an employee may not, while still employed, go beyond mere planning and preparation and act in direct competition with the employer."   Scanwell Freight Express STL, Inc. v. Chan, 162 S.W.3d 477, 481 (Mo. 2005)

(en banc) (citations omitted).   The duty of loyalty is separate and distinct from the employment contract a defendant has with his employer.   Curators of Univ. of Mo. v. Suppes, 583 S.W.3d 49, 66 (Mo. Ct. App. 2019).

Ronnoco contends that Peoples breached the duty of loyalty by assisting Thirsty Coconut with its bid to the Texas 20 purchasing co-op.   Although Ronnoco established that Peoples assisted Thirsty Coconut with its Texas 20 bid while he was still employed by Ronnoco and Trident, it did not establish that this action was in direct competition with Ronnoco.   See Scanwell, 162 S.W.3d at 481.   As previously discussed, Ronnoco was not a competitor in the Texas K-12 school market, and Texas 20 was not its customer.   While Peoples' actions in assisting Thirsty Coconut would appear to be in direct competition with Trident, Trident is not a party to this case and Ronnoco cannot assert its interests.   Ronnoco therefore does not establish a breach of the duty of loyalty owed to it, and Peoples is entitled to judgment on this claim.

### C.   Missouri Uniform Trade Secret Act ("MUTSA") - Count III

A claim for misappropriation of trade secrets under the MUTSA has three elements: (1) the existence of protectable trade secrets, (2) misappropriation of the trade secrets by the defendant, and (3) damages or entitlement to injunctive relief.   Secure Energy Inc. v. Coal Synthetics, LLC, 708 F.Supp.2d 923, 926 (E.D. Mo. 2010); Central Trust and Inv. Co. v. Signalpoint Asset Mgmt., LLC, 422 S.W.3d 312, 320 (Mo. 2014) (en banc).

Ronnoco established that while Peoples was employed by it and Trident, he had access to confidential information in Trident's Quickbase program, including Trident's customers' names and contact information, the beverage dispensing machines each customer had and the installation dates, what products were being sold to the customers, and at what prices.   Peoples also had access to Trident's confidential business information including its bidding and general sales strategies, products lines, and its customers' specific requirements, specifications, and purchases.   The Court

assumes without deciding that some or all of this information constitutes a trade secret under Missouri law.

Ronnoco established that Peoples downloaded the confidential information contained in Quickbase, took it with him to his new employer, and used it to compete against Trident. Ronnoco's evidence was that all of the confidential information in Quickbase belonged to Trident, however.   None of Ronnoco's confidential information was in Quickbase.   Ronnoco's MUTSA claim is based on its majority ownership of Trident and its entitlement to a percentage of Trident's profits as a result of that ownership.

Ronnoco's ownership interest in Trident does not give Ronnoco a protectable interest in Trident's trade secret information.   As discussed above, "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary."   Laredo Ridge Wind, 11 F.4th at 651 (quoting Dole Food, 538 U.S. at 474-75, citing 1 W. Fletcher, Cyclopedia of the Law of Private Corps. § 31, at 514 (rev. ed. 1999) ("The properties of two corporations are distinct, though the same shareholders own or control both.   A holding corporation does not own the subsidiary's property.")).

Ronnoco cites an unpublished out-of-circuit district court decision that concludes a "parent corporation has an ownership interest in the trade secrets of its wholly-owned subsidiary." Applied Materials, Inc. v. Advanced Micro–Fabrication Equip. (Shanghai) Co., Ltd, 2009 WL 10692715, at *3 (N.D. Cal. Nov. 30, 2009).   This conclusion is not persuasive because it is at odds with the black-letter corporate law cited above and does not reflect applicable Missouri law. Further, its source authority is readily distinguishable.   The court cited the Supreme Court's holding in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984), that a "parent and its wholly-owned subsidiary have a complete unity of interest."   Applied Materials, 2009 WL

10692715, at *3.   But in <u>Copperweld</u>, the Supreme Court addressed only "the narrow issue squarely presented: whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act."   467 U.S. at 767.   The instant case is not a Sherman Act antitrust matter, and there is no reason to believe <u>Copperweld</u>'s holding that a parent corporation and its wholly owned subsidiary can conspire in the context of antitrust law has any application here.   The Court declines to follow <u>Applied Materials</u>.

Ronnoco did not present any evidence to establish that Peoples misappropriated its trade secrets.   As a result, Peoples is entitled to judgment on the MUTSA claim.

D.   <u>Injunctive Relief – Count IV</u>

The standard for determining whether a permanent injunction should issue is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits.   <u>Bank One, Utah v. Guttau</u>, 190 F.3d 844, 847 (8th Cir. 1999). To obtain a permanent injunction, Ronnoco must show "(1) its actual success on the merits; (2) that it faces irreparable harm; (3) that the harm to it outweighs any possible harm to others; and (4) that an injunction serves the public interest."   <u>Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church</u>, 634 F.3d 1005, 1012 (8th Cir. 2011) (citing <u>Bank One, Utah</u>, 190 F.3d at 847).

Ronnoco did not prevail on merits of any of the claims for which it sought injunctive relief, and therefore such relief is not appropriate.   Ronnoco's claim for injunctive relief will be dismissed.

E.   <u>The Temporary Restraining Order is Vacated</u>

As previously stated, the Court temporarily restrained Peoples, his agents, and all other persons in active concert with him until further Order of the Court from directly or indirectly:

(1) With respect to confidential and proprietary information, including trade secrets, of Ronnoco/Trident, from disclosing, using, or providing any such

documents, information, or trade secrets, directly or indirectly, to anyone, except for the return of such documents, information, or trade secrets directly to Ronnoco or its attorneys;

(2) Acting, directly or indirectly (whether as an owner, employee, consultant, independent contractor or any other role) in any capacity with a company that directly competes with Ronnoco/Trident, including but not limited to Smart Beverage, d/b/a Thirsty Coconut; and

(3) Calling upon, soliciting, diverting, attempting to call upon, solicit, or divert (or assist in any of the foregoing), or accept business from/do business with any customer/potential customer of Ronnoco/Trident that was a customer/potential customer during Peoples' employment with Ronnoco/Trident.

(ECF No. 39 at 16.)[5]

The Court has found that Peoples did not form any customer relationships while employed by Ronnoco, did not disclose or use any of Ronnoco's confidential information or trade secrets, did not call upon, solicit, or divert any of Ronnoco's customers, and did not engage in any business or activity competitive with Ronnoco's business.   Ronnoco's claims on which the TRO was based fail on their merits.   As a result, the Court will vacate the TRO as erroneously issued.

F.   The Order of Contempt is Vacated

The Court granted Ronnoco's Motion for Contempt and held Peoples and non-party Thirsty Coconut in civil contempt for violating the TRO, after a hearing at which it found that Peoples continued to actively work for and with Thirsty Coconut based on the evidence presented and on Peoples' admissions.   The Court found that Peoples sent emails, made deliveries, serviced beverage dispensing machines, and coordinated payment issues for customers that he and Thirsty Coconut had diverted or were attempting to divert from "Ronnoco/Trident."   (ECF No. 97 at 5-7.)

---

[5]Ronnoco's motion for temporary restraining order did not ask the Court to restrain Peoples from inducing or attempting to induce Ronnoco's employees to leave its employ and the TRO did not contain such a restriction.

The Court awarded Ronnoco its reasonable attorney's fees incurred in bringing and prosecuting the Motion for Contempt, jointly and severally against Peoples and Thirsty Coconut, after finding that Ronnoco did not present evidence of any monetary damages it suffered as a result of the TRO violations.   (Id. at 13.)   The Court also imposed a conditional coercive daily fine of $100 against Peoples and $1000 against Thirsty Coconut for any days on which they took any action that violated the TRO's terms.   (Id. at 13-14.)

Compensatory and coercive civil contempt sanctions do not survive if the underlying injunction is vacated because it was issued erroneously.   'The right to remedial relief falls with an injunction which events prove was erroneously issued[.]'"   Klett v. Pim, 965 F.2d 587, 590 (8th Cir. 1992) (quoting United States v. United Mine Workers of Am., 330 U.S. 258, 295 (1947) (citations omitted)).   The Eighth Circuit recently reaffirmed this principle in Sisney v. Kaemingk, 15 F.4th 1181, 1200 (8th Cir. 2021) ("a [civil] contempt sanction compensating the movant for damages incurred as a result of the offending party's noncompliance while the order was in effect remains appropriate even after the order is no longer in effect, unless the order was 'vacated because it was issued erroneously.'") (quoting Klett, 965 F.2d at 590) (emphasis added).   See also ePlus, Inc. v. Lawson Software, Inc., 789 F.3d 1349, 1356-57 (Fed. Cir. 2015) ("Civil contempt sanctions must be set aside when the resolution of the case requires overturning the injunction on which those sanctions are based.").

This authority controls here.   The Court has vacated the TRO as erroneously issued because Ronnoco did not prevail on the merits of the claims on which the injunctive relief was based.   Consequently, the compensatory and coercive contempt sanctions against Peoples and non-party Thirsty Coconut must be set aside, and the Order of Contempt is vacated.

G.  Disposition of Bond

When the Court issued the TRO, it ordered Ronnoco to post security in the amount of $2,500 pursuant to Rule 65(c), Fed. R. Civ. P., to pay Peoples' costs and damages in the event he was found to be wrongfully restrained.  Ronnoco posted a cash bond of $2,500.  As the Court has determined that the TRO was erroneously entered, it will order the $2,500 security disbursed to Peoples.

## Conclusion

For the reasons discussed herein, the Court concludes that Plaintiff Ronnoco Coffee LLC failed to meet its burden to establish its entitlement to judgment on any of the claims in its Amended Complaint.  Defendant Peoples is therefore entitled to judgment.  The Court will vacate the Temporary Restraining Order as having been erroneously entered.  Because the basis for the Court's finding of contempt against Peoples and non-party Smart Beverage, Inc. d/b/a Thirsty Coconut has fallen away, the Court vacates its Order of Contempt.  The Clerk of Court will be directed to pay the $2,500 bond posted by Ronnoco to Defendant Peoples.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Charles Peoples is entitled to judgment on Plaintiff Ronnoco Coffee LLC's Amended Complaint.

**IT IS FURTHER ORDERED** that the Temporary Restraining Order (ECF No. 48) is **VACATED**.

**IT IS FURTHER ORDERED** that the Findings of Fact, Conclusions of Law, and Order of Contempt (ECF No. 97) are **VACATED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall pay to Defendant Charles Peoples from the Court Registry the $2,500 cash bond posted in this case by Plaintiff Ronnoco Coffee LLC.

**IT IS FURTHER ORDERED** that Defendant Peoples shall file a Memorandum to the Court that includes his mailing address for disbursement of the $2,500 bond.

An appropriate Judgment will accompany this Memorandum and Order.

*Ronnie L. White*

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this <u>16th</u> day of December, 2021.